264 F.Supp.2d 413 (2003)
Robert Lee WASHINGTON, Movant,
v.
UNITED STATES of America, Respondent.
No. 00-CV-761.
United States District Court, W.D. Virginia, Roanoke Division.
April 1, 2002.
*417 Robert Lee Washington, Beaver, WV, pro se.
Rick A. Mountcastle, U.S. Attorney's Office, Abingdon, VA, for U.S.

OPINION
JONES, District Judge.
Robert Lee Washington, proceeding prose, has filed this motion to vacate, set aside or correct sentence under 28 U.S.C.A. § 2255 (West Supp.2001). Washington challenges his federal sentence of imprisonment for 188 months imposed pursuant to convictions for possession with intent to distribute cocaine base, possession of a firearm by a convicted felon, and possession of a firearm by an unlawful user of controlled substances. Washington rais the following claims, as he describes them in his § 2255 motion:
(1) Counsel rendered ineffective assistance because he labored under a conflict of interest;
(2) Counsel rendered ineffective assistance during the pretrial stage of the prosecution, in that he:
(a) failed to adequately prepare and argue a motion to suppress evidence that was obtained in violation of the Fourth Amendment, and to file an amended motion to suppress evidence after the first trial ended in a mistrial;
(b) failed to investigate, research, and file a motion to dismiss the indictment by virtue of the fact that it was obtained by use of perjured testimony;
(c) failed to interview crucial witnesses before calling them to the stand, and to subpoena some witnesses;
(d) failed to move for a stipulation with the government, that Washington was previously convicted of cocaine distribution, and that he was a "crack/marijuana" addict;
(e) failed to procure an independent drug addiction expert, as well as an independent fingerprint expert;
(f) failed to research, and submit a justification defense theory with respect to Count Five of the indictment involving the Marlin .22 rifle Washington took from a young relative who had been mishandling the firearm, and could have shot an inattentive other relative;
(3) Counsel rendered ineffective assistance at trial, in that he:
(a) failed to object during the prosecution's opening statement, and thereby, failed to preserve a potential *418 prosecutorial misconduct issue for appeal;
(b) failed to move to disqualify government witness Clifford Bartosh from testifying further because of his admitted perjury at the first trial;
(c) failed to recall government witness Heather Martin for rebuttal cross examination;
(d) failed to object during the prosecution's closing argument, thereby failing to preserve a potential prosecutorial misconduct issue for appeal;
(e) failed to object to the court's ex parte meeting in chambers with juror Nanine Woodard;
(f) failed to deliver an intelligent summation of the case in his closing argument, which could best be described as unintelhgible rambling with no meaning whatsoever, failing miserably to address even the general principles of reasonable doubt; and
(g) failed to prepare and seek a lesser-included offense jury instruction with respect to Count Four of the indictment;
(4) Counsel rendered ineffective assistance at sentencing, in that he failed to move to withdraw from representation after it was then revealed to Washington that counsel was under investigation by the same United States Attorney's Office that was prosecuting Washington; and
(5) Counsel rendered ineffective assistance on appeal.
(§ 2255 motion i-iii.)
The respondent United States has answered and filed a motion to dismiss. The court notified Washington of the response as required by Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir.1975), and warned him that judgment might be granted for the United States if he did not respond to the answer. Washington has responded and therefore the underlying motion to vacate, set aside or correct sentence is now ripe for disposition.

I
In 1996, police officer Ross Sheets was involved in an undercover drug investigation of William Alexander "Bunkie" Crockett in Wythe County, Virginia. (First trial transcript ("Tl") 2-149.) On April 17, 1996, Sheets bought narcotics from Crockett. (Tl 2-179.) On April 19,1996, Sheets made a second drug purchase from Crockett. (Tl 2-150.)
On December 18, 1996, Sheets made a third narcotics purchase from Crockett. (Tl 2-85.) (Transcript of Suppression Hearing ("Suppression") 31.)[1] On that occasion, Crockett took the money he received from Sheets to purchase the drugs and traveled to the residence of Hicks Beam. (Suppression 31.) Crockett purchased the drugs from Beam and returned to Sheets. (Suppression 31.) Crockett was then arrested, and told the officers that he had purchased the drugs from Beam. (Suppression 31.) Crockett also *419 told the officers that he had observed firearms and cocaine at Washington's residence. (Suppression 31-32.) During the course of the investigation involving Crockett, which lasted for several months before December 1996, officers had observed Crockett going to Washington's residence. (Suppression 33.)
Deputy Sheriff Keith Dunagan obtained a search warrant from a state magistrate for Beam's residence that same day, December 18, 1996. (Suppression 31.) Certain of the information Crockett provided to the officers was confirmed during the search of Beam's residence. (Suppression 33.) The officers recovered guns, drugs, and the same currency (identified by serial number) given to Crockett by Sheets to purchase drugs in Beams' residence. (Suppression 55.) Also, Dunagan knew Crockett's reputation as a drug user. (Suppression 46.) A second warrant was obtained from the same magistrate that same day to search Washington's house. The affidavit for the search warrant stated:
A confidential reliable informant stated that two days ago it observed a firearm in the possession of Robert Washington. This informant stated that one week ago it had observed Robert Washington in possession of a firearm at his home described in section 2 of this affadvit [sic] and in the past it had observed as many as ten firearms in the home at one time. This informant stated that it had also observed cocaine at the Washington residence in the past. Robert Washington has a felony conviction for distribution of cocaine.
This informant has provided the applicant with intelligence information that is reliable and correct. This informant has provided the applicant with information that has led to the seizure of illegal drugs.
The affidavits for the search warrants for the residences of Beam and Washington were prepared at the same time. (Suppression 40.) Dunagan used the first search to establish the credibility of Crockett as an informant. (Suppression 40.) The state magistrate was aware that Dunagan prepared both affidavits at the same time and that Dunagan was using the first search to establish Crockett's credibility for the second search. (Suppression 42.)
The officers executed the search warrant for Washington's house the same day. Dunagan entered through the back door of the Washington residence while other law enforcement officers entered through the front of the residence. (Suppression 34.) When the officers entered the front of the residence, they observed a young woman named Heather Martin holding a plate and straw up to her face. (Second trial transcript ("T2") 292.) Chemists later determined that the plate contained cocaine residue. (T2 318.) While officers were entering the front of the residence, Dunagan observed Washington "run across the living room out of [his] sight and then back in, and ... through the kitchen." (Suppression 35.) Washington claims that after the officers entered his home, an officer handed him a copy of the search warrant and/or affidavit, but then took it back and wrote the second paragraph of the affidavit in front of Washington. (Suppression 4-5.)
During the search of Washington's house,[2] officers found six weapons: a Marlin *420 22 magnum rifle; a Remington Model 11 semiautomatic 12-gauge shotgun; a Browning semiautomatic 16-gauge shotgun; a Mossberg 500A 12-gauge pump shotgun; a Remington Model 11^48 semiautomatic 20-gauge shotgun; and a Winchester Model 1400 semiautomatic 16gauge shotgun.[3] (T2 118-125.) Officers discovered the Marlin .22 under the bed in Washington's room. (T2 302-03.)
During the search, offices also found a glass plate, a playing card, a short straw, a brown pill bottle containing marijuana cigarette butts, a rolled-up playing card with cocaine residue, a plastic container of inositol,[4] an electronic scale graduated in grams, small plastic baggies, a smoking device made from a deer antler, a brass smoking device, a metal smoking device, a small hemostat, straws of various lengths, a measuring spoon with white residue, a dinner plate with cocaine residue, two broken test tubes with cocaine residue, and a yellow metal alligator clip. (T2 134-85.) Shortly after the search, Washington's blood was drawn and tested for drug presence. His blood tested positive for marijuana use with four to six hours previous to the blood being drawn. (T2 273.)
After the search of Washington's house, Clifford Bartosh, a food store manager who runs a gun repair business on the side, contacted the police.[5] Bartosh told the authorities that Beam and Washington had given him several weapons to repair on two occasions. (T2 428.) On the first occasion, Beam and Washington came to see Bartosh with a Browning 338. (T2 429.) Beam presented the Browning 338 to Bartosh and told Bartosh that the gun belonged to Washington. (T2 429.) Washington stood silent when Beam told Bartosh that the gun belonged to Washington. (T2 429-30.) Bartosh put Washington's name on the "ticket" for the gun. (T2 430.) On another occasion when Beam and Washington delivered guns to Bartosh, Bartosh put Beam's name on the ticket. (T2 435.) Apparently, Washington never handed a gun to Bartosh or paid for any repairs. (T2 436, 438.) On December 20, 1996, Bartosh gave the Browning 338 to the police. (T2 431.)
A grand jury of this court returned a multi-count indictment against Washington, Beam, Martin, and Shirley Cochran.[6] Count one charged Washington with conspiracy to distribute or possess with intent to distribute five grams of cocaine base. Count three charged that Washington distributed 2.43 grams of cocaine base on June 6, 1996. Count four charged Washington of possession with intent to distribute cocaine base on December 18, 1996. Counts five through eleven charged Washington with possession of a firearm and ammunition after having been convicted of a felony. Counts twelve through eighteen charged Washington with possession of a firearm by an unlawful drug user. Counts nineteen through twenty-three charged *421 Washington with possession of a firearm having been convicted of a felony.
Washington retained attorney Rickey G. Young as his counsel. On Washington's behalf, Young moved to suppress all evidence obtained from the search of Washington's house on the grounds that the search warrant was not supported by probable cause, the search warrant inventory had not been completed in compliance with state law, and the affidavit behind the warrant did not show that the firearms had been shipped in interstate commerce. He also moved to dismiss certain counts of the indictment for multiplicity. Both motions were denied.
Washington's first trial, in February 1998, ended in a mistrial due to a hung jury. A second trial commenced on April 1, 1998. At the conclusion of a three-day trial, the jury found Washington guilty of all counts in the indictment.[7]
The court scheduled a sentencing hearing for June 29, 1998. On the date of the original sentencing hearing, the court was advised that Young, Washington's attorney, was himself under investigation by the United States Attorney's office. Washington was advised of the situation in the following manner:
THE COURT: Some matters have been brought to my attention that I need to address the defendant. Mr. Washington, I am going to continue, postpone your sentencing because I have today received communication from the United States Attorney advising me that your counsel, Ricky [sic] Young, is the target of a grand jury investigation being conducted by the Office of the of the [sic] United States Attorney for this district.
Under those circumstances, I am going to reschedule your sentencing, and in the meantime ask counsel to submit to me their respective positions as to what course of action the Court should follow in those circumstances.
And I wish you, Mr. Washington, to consider whether you, yourself, desire Mr. Young to continue to represent you in this case.
The concern is that it might be claimed or felt that because Mr. Young, your attorney, is undergoing criminal investigation, apparently in some matter not related to your case, but still undergoing some criminal investigation, that he might, in an effort to curry favor with the prosecutor, take some action in your case that might be detrimental to you.
That's my concern, and I'm not saying that that's happened, or that it would happen. As far as I can tell, Mr. Young's representation to you to date has been vigorous, and I know of nothing that he has done or failed to do at this time in his obligation and responsibility to you.
But I want to give you an opportunity to consider whether or not you wish to continue with Mr. Young, and if you do not, to make what other arrangements you wish.
On the other hand, I may wish to consider whether I will permit Mr. Young to continue to represent you, and that is the reason I want the parties to make submissions to me to advise me what they think the Court should do.
And I'm not going to require you, Mr. Washington, to make that decision right now. I want you to think about that, and obviously you may wish to talk to Mr. Young and others, but that's something that I want you to do.

*422 And I'm going to, to postpone this sentencing so that I can reflect on all of these matters.
...
And Mr. Youngexcuse meMr. Washington, if you obtain new counsel, you need to have that new attorney present on that day prepared to represent you, or have that new attorney advise the Court if that new attorney needs additional time to be prepared to represent you. So, if you have new counsel, you need to have that new counsel involved before that day,
(June 29, 1998 hearing 2-4, 6-7.) The court requested responses from the parties on the propriety of Young's continued involvement in the case, and rescheduled the sentencing hearing for July 29,1998.[8]
The sentencing hearing reconvened on July 29, 1998. "Based on the Government's representations," the court determined not to disqualify Young from continued representation. (Sentencing 3.) The court then addressed Washington as follows:
THE COURT: Mr. Washington, if you'd stand, please, sir. Mr. Washington, at the last hearing when you were here we discussed the question of Mr. Young's continued representation of you. And I have just ruled that I see no reason why Mr. Young cannot continue to represent you in this case by virtue of the circumstances that were brought to the Court's attention at the last hearing which we discussed at that hearing.
If you have any motion or comment that you wish to make to me in regard to Mr. Young's representation of you, this would be an appropriate time for you to do that.
WASHINGTON: Your Honor, I don't have anything to say about it.
(Sentencing 4-5.)
Young continued to represent Washington at the sentencing hearing. The court sentenced Washington to imprisonment for a term of 188 months on each count, to be served concurrently. Washington directly appealed his convictions with Young as his appellate counsel. On appeal it was argued that the district court improperly denied the motions to suppress, to dismiss the indictment, and to exclude evidence of his prior convictions, and that the convictions were not supported by sufficient evidence. The Fourth Circuit affirmed. See United States v. Washington, 1999 WL 668130, 1999 U.S.App. LEXIS 14826 (4th Cir. June 29,1999) (unpublished).
Before Washington's sentencing hearing, other judges in the United States District Court for the Western District of Virginia addressed Young's potential conflict of interest. The United States Attorney for the Western District of Virginia began filing motions to disqualify Young from representing criminal defendants in federal court in April 1998. See Jen McCaffery, Jury Indicts Lawyer for Tax Evasion, Fraud; Martinsville Attorney Represents Roanoke Police Officer Frederick Pledge, Roanoke Times & World News, Aug. 12, 2000, at Bl. Michael Hemphill, Drug Lawyer Becomes Suspect Himself; Prosecutors Seek to Disqualify Martinsville Attorney From Cases, Roanoke Times & World News, Sept. 5,1999, at Bl. As Young noted at the sentencing hearing, Judge James H. Michael, Jr. had granted the government's *423 motion to disqualify Young in the criminal drug prosecution of John F. Banks. See McCaffery, Jury Indicts Lawyer for Tax Evasion. Judge James C. Turk followed suit after Judge Michael's decision "to keep uniformity in the district" by disqualifying Young from representing Alfred Lee Day against drug charges. See Hemphill, Drug Lawyer Becomes Suspect Himself. After Young was permitted to continue his representation of Washington in this case, the other district judges permitted Young to represent criminal defendants in federal court. On August 31, 1998, Judge Turk permitted Young to rejoin Day's defense as cocounsel. In late August, 1999, Judge Jackson L. Kiser denied the government's motion to disqualify Young. See id. In early September, 1999, Judge Norman K. Moon denied a similar government motion as well. See id. On October 12, 1999, the Fourth Circuit rejected Banks' claim that he was denied his choice of counsel due to Judge Michael's decision to disqualify Young. See United States v. Banks, 1999 WL 812333, at *1, 1999 U.S.App. LEXIS 25485, *2-3 (4th Cir. Oct. 12,1999) (unpublished).[9]
A grand jury of this court indicted Young on August 10, 2000, on five counts of misdemeanor failure to file taxes and two counts of felony mail fraud. At trial, the court granted Young's motion for acquittal on the felony counts. A jury convicted Young on the misdemeanor tax charges. By judgment of July 27, 2001, Young was sentenced to eighteen months imprisonment. The facts of Young's case had no connection with any of the events in Washington's case.

II
To prove ineffective assistance of counsel, Washington must show that his counsel's performance was deficient and that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Deficient performance" is that which falls below an objective standard of reasonableness. The court must be highly deferential to counsel's performance because there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. Trial strategy and tactics are accorded much deference by reviewing courts in conducting the "deficiency" analysis. See id. at 689, 104 S.Ct. 2052. "Prejudice" means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052.
Ineffective assistance by counsel may occur under circumstances where the defendant's attorney operated under a conflict of interests. See Cuyler v. Sullivan, 446 U.S. 335, 348-349, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). However, absent an objection to such representation, the defendant must show that the conflict "actually affected the adequacy of his representation." Id. An actual conflict adversely *424 affects the representation when the petitioner demonstrates that: (1) counsel could have, but did not, pursue a plausible defense strategy or tactic; (2) the strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the tactical decision; and (3) counsel's failure to pursue the strategy or tactic was linked to the actual conflict. See Mickens v. Taylor, 240 F.3d 348, 357-58 (4th Cir.2001) (en banc), affd, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). The failure of the trial court to inquire into a conflict does not relieve the petitioner from his burden of showing that the conflict adversely affected counsel's performance. See Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237,1238,152 L.Ed.2d 291 (2002).
Generally, courts have held that when an attorney is being investigated by the same office that is prosecuting his client, a conflict of interests may exist. See Armienti v. United States, 234 F.3d 820, 824-25 (2d Cir.2000); Briguglio v. United States, 675 F.2d 81, 82-83 (3rd Cir.1982).
A criminal defendant may waive the right to conflict-free counsel if the waiver is knowing, intelligent, and voluntary. See United States v. Brown, 202 F.3d 691, 697 (4th Cir.2000); United States v. Gilliam, 975 F.2d 1050, 1053 (4th Cir.1992); United States v. Akinseye, 802 F.2d 740, 744-45 (4th Cir.1986). A valid waiver of a particular conflict "bars any later claim of ineffective assistance growing from that conflict." United States v. Lowry, 971 F.2d 55 (7th Cir.1992). For a conflict waiver to be knowing, the defendant must know the general nature of the conflict and the attendant risks. However, due to the secrecy surrounding grand jury proceedings, the court will not always be able to inform a criminal defendant of the precise nature of the investigation under which his attorney is a target. See Fed.R.Crim.P. 6(e). Generally, when the court advises a defendant that his attorney is under investigation by the same office that is prosecuting him, and that the attorney might try to curry favor with the prosecution, the court's advice can form the basis of a knowing waiver. See Brown, 202 F.3d at 698 ("[I]f a defendant waives the conflict with knowledge of the crux of the conflict and an understanding of its implications, the waiver is valid-even if the defendant does not know each detail concerning the conflict."). In a habeas corpus action based on conflicted, ineffective assistance, the petitioner has the burden of showing that he did not knowingly, intelligently, and voluntarily waive the right to conflictfree counsel. See Gilbert v. Moore, 134 F.3d 642, 653 (4th Cir.1998).
Absent a showing of cause and prejudice, or that a fundamental miscarriage of justice will occur, nonjurisdictional claims that could have been raised on direct appeal cannot be raised for the first time in a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255. See United States v. Frady, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). A § 2255 movant demonstrates that a fundamental miscarriage of justice will occur with a showing of actual innocence. See Schlup v. Delo, 513 U.S. 298, 321,115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Claims litigated fully on direct appeal cannot be relitigated in a § 2255 motion. See Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976).

III
Because Young was under investigation by the same office prosecuting Washington, a potential conflict of interests arose. See Armienti, 234 F.3d at 824-25; Briguglio, 675 F.2d at 82-83. Assuming that Young had knowledge that he was being investigated before trial, the *425 potential conflict may have risen to an actual conflict at that time. Even assuming an actual conflict, however, Washington still must demonstrate that Young's performance adversely affected the representation. Accordingly, Young must show that: (1) counsel could have, but did not, pursue a plausible defense strategy or tactic; (2) the strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the tactical decision; and (3) counsel's failure to pursue the strategy or tactic was linked to the actual conflict. See Mickens, 240 F.3d at 357-58.
Regarding the first prong of the "adverse effect" test, Washington identified certain plausible trial strategies and tactics that Young could have, but did not, pursue. Specifically, Young could have sought to dismiss the indictment as based on perjured testimony, see claim (2)(b); interviewed certain witnesses, see claim (2)(c); moved for a stipulation with the government regarding the prior offense, see claim (2)(d); procured an independent drug addiction expert, see claim (2)(e); submitted a justification defense, (2)(f); objected to the prosecution's opening remarks, see claim (3)(a); sought to exclude Bartosh's testimony, see claim (3)(b); recalled Martin for cross-examination, see claim (3)(c); objected to the prosecutors closing remarks, see claim (3)(d); objected to the court's meeting with juror Woodard, see claim (3)(e); and prepared a lesser included offense instruction, see claim (3)(g). Washington's other claims do not relate to strategies or tactics not taken by Young.
As to the second prong, the court finds that certain of the claims are not objectively reasonable under the facts of the case known to the attorney at the time of the tactical decision because they are so patently lacking in merit. Those claims include the portion of claim (2)(e), where Washington alleges that Young could have called a drug addiction expert, claim (2)(b), and claim (3)(e).
As to the third prong, Washington must show some nexus between the conflict and the inaction or alternate strategy that was not pursued. The conflicting interest where the attorney is under investigation by the same office that is prosecuting the client is the attorney's interest in currying favor with the prosecution, see Brown, 202 F.3d at 697, or the fear that the attorney may overzealously represent the client and fail to cooperate when cooperation would benefit the client, see Lowry, 971 F.2d at 62. The failure to move to dismiss the indictment, interview witnesses, submit a justification defense, recall Martin,[10] or seek a lesser-included offense instruction have no connection to the conflicting interest. Rather, to the extent that any of those underlying ineffective assistance claims have merit, it would only be due to general deficient performance, rather than an attempt to curry favor or a failure to cooperate.
Arguably, counsel's failure to object to the prosecutor's remarks was motivated by a desire not to anger the prosecutor personally.[11] Also, the failure to stipulate to *426 the prior offense may have resulted from Young's particular unwillingness to cooperate with the government. As it appears that Washington has identified certain objectively reasonable strategies that counsel did not pursue that were related to the conflicting interest, the court concludes, for purposes of adjudicating this motion to dismiss before having held an. evidentiary hearing, that counsel labored under an actual conflict.
Throughout his pleadings, Washington makes several arguments to meet his burden that he did not knowingly, intelligently, and voluntarily waive conflictfree counsel: (1) his "perplexed one-liner" at the sentencing hearing that he had nothing to say was not a sufficient verbal waiver; (2) he did not orally object at sentencing because the court's statements made him believe that the court had decided not to disqualify Young; (3) the court did not satisfy its duty to inquire into the conflict; (4) the waiver was not knowing because the pleadings from the government on the issue were submitted under seal; (5) he was not advised that Young had been disqualified by other judges in the district; (6) Young advised him not to worry about anything; and (7) Washington did not consult independent legal advice.
The record reveals that at the first sentencing hearing, the court addressed Washington personally and asked him to consider if he wanted Young to continue to represent him. (June 29, 1998 hearing 2.) The court advised Washington of the relevant risks inherent in the conflict of interest, in that "[Young] might, in an effort to curry favor with the prosecutor, take some action in your case that might be detrimental to you." (June 29, 1998 hearing 3.) The court advised Washington to seek independent advice, as it recommended that he talk to "Mr. Young and others." (June 29, 1998 hearing 3, emphasis added.) The court directed the parties to submit briefs on the issue. (June 29, 1998 hearing 3.) The court gave Washington one month to consider the matter and retain new counsel, if desired. (June 29, 1998 hearing 6-7.) Moreover, the court advised Washington that a new attorney could request additional time to prepare Washington's defense. (June 29, 1998 hearing 6-7.) At the reconvened sentencing, after the court expressed its reluctance to disqualify Young, the court told Washington, "If you have any motion or comment that you wish to make to me in regard to Mr. Young's representation of you, this would be an appropriate time for you to do that." (Sentencing 4.) In response, Washington said, "Your Honor, I don't have anything to say about it." (Sentencing 4-5.) It is against this factual background that Young must demonstrate that he did not waive conflict-free counsel. See Gilbert, 134 F.3d at 653.
The record makes clear that the court inquired into the potential conflict by requesting briefs and addressing the parties and attorneys at the first sentencing hearing. And while Young complains that the briefs were submitted under seal, this procedure was required under the circumstances to preserve grand jury secrecy. Washington's "perplexed one liner" that he had nothing to say about Young's continued representation was a clear waiver under the circumstances, after the court had advised him to consult others and retain a new attorney, if he desired, in light of the possible conflict. The fact that Washington had not fired Young or retained a new attorney by the second sentencing hearing *427 indicates Washington's waiver, if his oral response did not. The fact that the court had already decided not to disqualify Young does not change the fact of Washington's waiver because the court directed Washington to consider personally whether he wanted Young to continue representing him. The court necessarily decides not to disqualify counsel in every case where the defendant is permitted to waive conflict-free counsel. Also, Washington had a full month before the court indicated that it would not disqualify Washington to consult others, hire new counsel, or fire Young. The fact that Young did not actually seek independent legal advice is unavailing to Washington because the court specifically counseled Washington to seek independent advice.
Claim (2)(a) alleges that counsel failed to adequately prepare and argue a motion to suppress evidence that was obtained in violation of the Fourth Amendment, and to file an amended motion to suppress evidence after the first trial ended in a mistrial. In support of claim (2)(a), Washington alleges certain facts that he claims counsel did not argue in support of the motion to suppress. Washington alleges that Crockett told Dunagan that he had seen firearms at Washington's residence "in the past," and that he had smoked crack "in the past" with Washington "in the surrounding woods of his residence," rather than "two days ago" and "one week ago," as is stated in the affidavit. (§ 2255 motion 35-36, 40, underscoring in original.) Washington claims also that Dunagan had both search warrants signed at the same time. Washington faults Dunagan for leaving out the fact that the confidential informant was a crack dealer himself who had been offered inducements to give information to the authorities. Moreover, Washington also claims that Dunagan was infuriated by the fact that Washington, a black man, was associating with a young white woman. Washington faults counsel for using a form motion to suppress with few details, and for characterizing the search as "warrantless."
Washington does not explain his source of information that Crockett told Dunagan something other than what was contained in the affidavit for the warrant to search Washington's residence. Washington argues that Dunagan was visibly upset that Washington associated with a young white woman. Bad intent alone, however, does not render a warrant illegal. It must be shown that the affiant included a material falsehood in the search warrant affidavit without which probable cause is lacking. See Franks v. Delaware, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Supreme Court has outlined the showing that a defendant must make to warrant an evidentiary hearing on a claim that the warrant contains a deliberate, material falsehood:
There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.
Id. at 171-72, 98 S.Ct. 2674.
Washington does not explain how he knows that Crockett told Dunagan that he had seen weapons in Washington's residence "in the past" as opposed to within two days or one week. Washington does not offer an affidavit from Crockett, testimony of any witness to Crockett's statement, or an explanation as to why he has no proof of his claim. Accordingly, the *428 court concludes that Washington has failed to make a showing approaching that which is required by Franks.
Washington's assertion that both search warrants were signed at the same time is pure speculation and runs contrary to the court's findings of fact on the motion to suppress.[12] (February 17, 1998 Order and Memorandum Opinion 4.) Regarding the failure to indicate that Crockett had been promised leniency to provide information on other drug users, that defect does not render the warrant unsupported by probable cause. In fact, the fact that the informant had been promised leniency, if true, might only enhance his credibility. See United States v. Miller, 925 F.2d 695, 699 (4th Cir.1991) ("The informant's interest in obtaining leniency created a strong motive to supply accurate information. The informant hoped that by giving reliable information she would receive a lenient sentence. If she provided false information she had nothing to gain and could have risked an additional charge for falsification.").
Regarding counsel's use of what appears to Washington to be a motion to dismiss short on details, that claim is meritless because an evidentiary hearing was held on the motion to suppress where counsel was able to call witnesses and supplement the arguments made in his motion to suppress. Regarding counsel's mischaracterization of the search as "warrantless" in the motion to suppress, it is evident from the rest of the motion to suppress that Young knew that the search was conducted pursuant to a warrant because he challenges the magistrate's probable cause determination.
Moreover, Washington does not show how he was prejudiced by counsel's inadvertent mischaracterization of the search as "warrantless." Accordingly, the court finds that Washington has not identified any deficient or prejudicial error in connection with Young's handling of the motion to suppress. See Strickland, 466 U.S. at 687,104 S.Ct. 2052.
Claim (2)(b) alleges counsel rendered ineffective assistance for failing to move to dismiss the indictment based on perjured testimony before the grand jury. Washington claims that either Dunagan or Crockett told the grand jury that Crockett observed firearms in Washington's residence two days or one week before Washington's residence was searched. However, Washington does not cite to any transcript or affidavit to indicate that anyone told the grand jury that Crockett saw firearms at Washington's residence two *429 days or one week before the search. Washington does not bring to the court's attention any evidence that Crockett or Dunagan even testified before the grand jury. Rather, Washington infers from the charges in the indictment that there must have been perjured testimony before the grand jury. For example, Washington argues speculatively that "[w]hatever activities that was described to the grand jury, which produced the `probable cause' to indict on the `conspiracy' count, was perjured." (§ 2255 motion 44.) Accordingly, the court concludes that Washington has not demonstrated that counsel acted deficiently, or that but for counsel's failure to investigate alleged perjury before the grand jury, the result of the trial would have been different. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
In claim (2)(c), Washington alleges that counsel failed to interview crucial witnesses before calling them to the stand, and to subpoena other witnesses. Specifically, Washington alleges that: had counsel interviewed defense witness Jessica Findley before calling her to the stand, he would have learned that Kisha Findley had accompanied Martin to other places to buy cocaine base and marijuana; had counsel obtained the attendance of Felix Webb, Webb could have testified at trial; had counsel interviewed Crockett before the first trial, he would have been able to better crossexamine Dunagan; and had counsel interviewed other members of Washington's family, counsel could have presented a better justification defense.
Regarding the failure to interview Jessica Findley, the court believes that, based on Washington's proffer, Kisha Findley's testimony would have been cumulative to Jessica's testimony. Jessica Findley testified that Martin told her that Martin had purchased the cocaine from a source other than Washington. (T2 585-87.) According to Washington, Kisha Findley would have testified that she accompanied Martin to other places to purchase cocaine. Also, whether Martin had purchased cocaine from a source other than Washington on certain occasions was not the ultimate issue in this case. Moreover, Martin's testimony was seriously impeached at trial by the revelation that she had used cocaine two days prior to trial, by the fact that she would not reveal her drug sources to defense counsel, and by her admission that she had "a problem telling [defense counsel] the truth about who gave [her] the cocaine." (T2 466-70.) All this is to say that the court does not believe that the outcome of the trial would have been different had counsel interviewed Jessica Findley before trial. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Washington does not make any proffer as to Felix Webb's testimony. Accordingly, the court cannot sustain the ineffective assistance challenge to counsel's failure to secure Webb's attendance at trial because Washington has not alleged any prejudice. As to counsel's failure to interview Crockett before the first trial so as to prepare to cross-examine Dunagan, it is unlikely that Crockett's counsel would have permitted Crockett to testify at trial because his statements made under oath could have been used at a later prosecution. Moreover, Washington fails to explain how interviewing Crockett would have helped cross-examine Dunagan.[13]
*430 Regarding Young's failure to interview other members of Washington's family to support the justification defense, Calvin Gilmer (T2 505-06), Levon P. Washington (T2 564), and Curtis Elston (T2 577), all testified regarding an incident where Washington took the .22 Marlin (later found under Washington's bed) away from a younger relative who was mishandling the gun. Any additional evidence from family members on that point was unnecessary. Moreover, the justification defense does not legally justify Washington's continued possession of the gun after the emergency with the younger relative abated. See claim (2)(f) below. Accordingly, the court concludes that Washington has not demonstrated that counsel rendered deficient or prejudicial assistance for failure to interview any of the witnesses he has identified. See Strickland, 466 U.S. at 694,104 S.Ct. 2052.
Claim (2)(d) alleges that counsel rendered ineffective assistance for failing to stipulate to Washington's 1984 conviction for drug distribution. Virginia State Police officer J.B. Williams testified briefly at trial to establish that Washington had a prior conviction for drug distribution. The court gave a cautionary instruction that Williams testimony could be considered only as evidence of the prior conviction and Washington's intent to distribute drugs. (T2 458.) To the extent that Washington challenges the introduction of the prior conviction as evidence of his intent, that claim has been fully litigated on direct appeal, and cannot be considered in this collateral review. See Boeckenhaupt, 537 F.2d at 1183. In this case, the failure to stipulate was only minimally prejudicial, if at all, because Williams' testimony on the prior conviction was brief and devoid of details regarding the prior offense. Accordingly, the court concludes that counsel did not render ineffective assistance for failing to stipulate to the prior conviction. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Claim (2)(e) alleges that counsel failed to procure an independent drug addiction expert and an independent fingerprint expert. Regarding an addiction expert, Washington claims that an addiction expert would have testified that "most addicts `share' their drug of choice with other addicts, without knowing that such sharing would be considered as `distributing drugs.'" (§ 2255 motion 56.) Also, Washington alleges, the addiction expert would have testified as to "clinical expectations of society, against drug addicts being 'locked up' for possessing the very compulsion for their psychopathology." (§ 2255 motion 56.) However, the Fourth Circuit has rejected a similar attempt to introduce evidence that addiction negates specific intent to distribute drugs. See United States v. Moran, 1991 WL 125461, *3,1991 U.S.App. LEXIS 14991, *10-11 (4th Cir. July 12, 1993) (unpublished). Moreover, Washington's proffered expert testimony that he intended to share the drug without knowing that it would be considered distribution, does not support a valid defense. Sharing with friends is distribution, and it is no defense that Washington did not know that his acts would be considered distribution under 21 U.S.C. § 841(a). See United States v. Washington, 41 F.3d 917, 919 (4th Cir.1994) ("The record clearly *431 demonstrates that Washington was not involved in any way in the trafficking of drugs. He did not sell drugs, and he was not a courier of drugs. He simply bought cocaine, which he planned to use himself and to share with his friends. However, Washington's intent to share the cocaine with others is sufficient for a court to find that he possessed drugs with intent to distribute.").
The prosecution introduced a fingerprint analyst to identify a fingerprint left on a firearm. On cross-examination, the analyst testified that there is no scientific way to determine the age of a fingerprint, but he expressed "doubt" that there would be sufficient moisture in a twenty-year-old latent fingerprint to which fingerprint powder would adhere. (T2 385.) Washington argues that if he could have proven that his fingerprint was placed on the firearm before 1984, the fingerprint would not prove that he possessed the firearm when he was a felon. It is uncertain if any fingerprint expert could determine, with a reasonable degree of certainty, if the fingerprint was placed on the firearm before 1984. Washington's speculation that "effective trial counsel should have known that there has got to be an expert who would disagree with [the fingerprint analyst's] opinion" does not earn him a new trial. Moreover, it is unlikely that the result of the trial would have been different even if it had been shown that the fingerprint predated Washington's conviction because Washington was convicted of possessing the other firearms which did not have fingerprints. Ultimately, the issue is not whether a certain fingerprint predated 1984, but whether Washington "possessed" the firearms, actually or constructively. Accordingly, the court concludes that counsel did not render ineffective assistance of counsel for failing to call at trial an addiction expert or an independent fingerprint expert.
In claim (2)(f), Washington claims that counsel rendered ineffective assistance for failure to seek an instruction on a justification defense to being a felon in possession of a firearm. Washington alleges that he observed a younger relative handling the .22 Marlin firearm recklessly at a family reunion and that he took the firearm from the younger relative. Washington alleges that he handed the firearm to another relative who stored the firearm under Washington's bed, where it was found when the authorities searched his house. The testimony of Calvin Gilmer (T2 505-06), Levon P. Washington (T2 564), and Curtis Elston (T2 577), support Washington's story that he seized the firearm from the younger relative who was handling it recklessly.
To be entitled to the defense of justification, a defendant must produce evidence that would allow the factfinder to conclude that he:
(1) was under unlawful and present threat of death or serious bodily injury;
(2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;
(3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and
(4) a direct causal relationship between the criminal action and the avoidance of the threatened harm.
United States v. Crittendon, 883 F.2d 326, 330 (4th Cir.1989). Constructive or joint possession of a firearm by a felon is sufficient to support a conviction under 18 U.S.C.A. § 922(g)(1) (West 2000). See United States v. Gallimore, 247 F.3d 134, 137 (4th Cir.2001).
*432 Washington presents no evidence to justify his continued possession, albeit constructive, of the .22 Marlin firearm. After Washington dispossessed his younger relative of the firearm, the justified possession of the firearm abated. See United States v. Mason, 233 F.3d 619, 625 (D.C.Cir.2000) ("[I]t is the retention of [a firearm], rather than the brief possession for disposal ... which poses the danger which is criminalized by felon-in-possession statutes.") Thus, Washington was not justified to constructively possess the firearm under his bed, and counsel's failure to seek a justification instruction was neither deficient nor prejudicial.
Claim (3)(a) is that counsel rendered ineffective assistance at trial for failing to object during the prosecution's opening statement and thereby failing to preserve a potential prosecutorial misconduct issue for appeal. Washington objects to the following comments made during the government's opening statements: "All of the evidence taken together and all of the evidence that you'll hear resulted in a grand jury indictment" (T2 78); "But they knocked at what I'll call the back door and saw Mr. Washington scurrying around" (T2 79); certain unidentified statements minimizing the jury's independence; and, "It's very important to Mr. Washington, and remember that it's also very important to society, to the Government, to the people of the United States, whom J repcent[!]." (T2 84, § 2255 motion 68, holding, underscoring, and exclamation in original.)
Regarding the mention of the grand jury, the statement was a factual one that explained the procedural history of the case to the jury. The prosecutor explained that the indictment was only "the charging instrument," and the prosecution did not ask the jury to infer guilt from the grand jury's indictment. Before opening statements, the court instructed the jury that "[t]he indictment or charges against the defendant brought by the government is only an accusation and nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate." (T2 74.) Regarding the officers' observation of Washington "scurrying around," the remark was a permissible characterization of Dunagan's trial testimony. (T2 198-99.) Finally, the court is convinced that if the prosecutor's statement that he represents society and the people of the United States was error, counsel's failure to object to the remark did not cost Washington an acquittal.
In regard to each of the prosecutor's comments, the court instructed the jury that the statements of the attorneys were not evidence. (T2 72.) Moreover, counsel's objection might have heightened any prejudice attendant to the prosecution's remark by drawing the jury's attention thereto, and thus there are strategic considerations that factor into the decision to object to counsel's remarks. See Evans v. Thompson, 881 F.2d 117, 125 (4th Cir. 1989) (decision not to object is a tactical decision). Accordingly, the court concludes that Washington has not shown that but for counsel's failure to object to the remarks, the outcome of the trial would have been different. See Strickland, 466 U.S. at 694,104 S.Ct. 2052.
Claim (3)(b) is that counsel rendered ineffective assistance for failing to move to exclude Bartosh as a witness based on his prior perjury regarding who made the initial contact between Bartosh and the authorities. However, the only proper remedy was for counsel to impeach Bartosh with his prior inconsistent statements made at the first trial, as counsel did. (T2 432-33.) Moreover, Washington has not proven that Bartosh actually committed perjury at the first trial. Perjury *433 occurs when, "[a] witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Washington had not shown Bartosh's intent or that the subject of his inconsistent statements were material. Accordingly, the court concludes that counsel did not render ineffective assistance for failing to move to exclude Bartosh's testimony at the second trial.
Claim (3)(c) is that counsel rendered ineffective assistance for failing to recall government witness Heather Martin for rebuttal cross examination. However, as indicted in the recitation of facts above, Martin was recalled once as a witness to testify that she had taken drugs just a few days prior to the second trial. (T2 466-70.) Young cross-examined Martin quite effectively regarding her unwillingness to name her drug source, forcing her to admit that she "ha[s] a problem telling [Young] the truth about who gave [her] the cocaine." (T2 470.) Moreover, Young tried, albeit unsuccessfully, to elicit testimony from Martin that she brought cocaine to Washington's house. (T2 470.) The next day, the prosecutor informed the court that Martin had been sentenced for parole violation, and he stated initially that she admitted to "having purchased cocaine and marijuana for the last several weeks." (T2 599.) After some initial confusion between Young and the court (T2 602-03), it was decided that the attorneys would listen to the recorded confession of Martin to determine if she admitted that she actually purchased cocaine (T2 604). Young and the prosecutor listened to the tape and determined that Martin did not admit that she purchased cocaine. (T2 607.) Young conceded, and the court agreed, that' [t]he only thing [on the tape] was that Gator or someone gave her cocaine, and that's my understanding of the testimony. I don't know that that would be that much significant from the testimony she gave yesterday." (T2 607.) Accordingly, Young and the court agreed that Martin had not admitted to anything inconsistent with her recalled testimony the previous day.
Washington claims that counsel,

incompetently agreed to go with the government counsel to listen to "some" recording of the sentencing proceeding of Heather Martin. It is Movant Washington's submission that trial counsel sold his opportunity to further impeach Ms. Martin, to his interest to appease the office of the United States Attorney that was investigating him. To show them, that he was one of them; he did not want to further embarrass their "star witness."
(§ 2255 motion 79, underscoring and holding in original.) However, had Young not wanted to embarrass the government's "star witness," he would not have recalled her to impeach her after learning of her recent drug use. Moreover, there was no admission on the tape that Martin purchased drugs, so there was nothing to gain by recalling Martin. Her admission to having recently used drugs had been covered by Martin's recalled cross-examination the previous day. Accordingly, the court believes that Washington has not shown that counsel acted deficiently in failing to recall Martin after learning that she had been sentenced for her recent drug use. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (1984).
Claim (3)(d) is that counsel rendered ineffective assistance for failing to object during the prosecution's closing argument, thereby failing to preserve a potential prosecutorial misconduct issue for *434 appeal. Specifically, Washington objects to the government's repeated reference to Washington's residence as a "crack house," for relying on Bartosh's testimony, for mentioning that Martin had been convicted, and for making a "conscience of the community" argument.
The prosecutor made only three references to a crack house. (T2 615, 619, 626.) Young made three references to a crack house himself. (T2 649.) Moreover, Washington does not deny that he had crack at his house when he was arrested. Accordingly, given the relative infrequency of the prosecutor's use of the term, defense counsel's use of the term, and the undisputed nature of certain of the evidence, the court concludes that counsel did not render ineffective assistance for failing to object to the prosecution's reference to a crack house. Also, there is nothing objectionable about the government's mention of Bartosh's testimony, despite Washington's unproven insistence that Bartosh perjured himself and that the government knew Bartosh had perjured himself.
Washington objects to the prosecutor's insinuation that Martin pled guilty when he said:
Why does Heather Martin come to Bob Washington's if he's not a crack dealer, if he's not comfortable with people smoking crack at his house, if it's not a crack house? She's an addict. She's admitted guilt. She's doing her sentence, and there she is in the room. So you have the final link in the chain, have a crack addict who's a purchaser, who's a consumer.
(T2 626.)
Martin testified on direct examination that she had been convicted for her role in the offense on direct examination. (T2 388.) It was the prosecution's theory of the case, not some impermissible insinuation, that Washington distributed drugs to Martin, and that Martin was guilty of certain crimes. Accordingly, the remark was not improper.
The final allegedly improper remark made by the prosecutor during closing was this:
... a jury of ordinary citizens is called together to make a decision about what we as a society will tolerate, and you have to ask yourselves, "Js this conduct to be tolerated, or is Mr. Washington to be convicted?" You see, conviction by a jury is just this: It's just telling the truth. The verdict is just that. It's just telling the truth. He was a crack distributor. He was a felon in possession of a firearm, and he was a user in possession of a firearm.
Washington alleges that the comment "appealed to the passion of the jury, by stating an `us' against `him' affirmation." (§ 2255 motion 82, holding in original.) It is clear that prosecutors may ask jurors to act as the "conscience of the community" as long as the comments are not intended to inflame the passions of the jury. See United States v. Koon, 34 F.3d 1416, 1444 (9th Cir.1994); United States v. Sanchez-Sotelo, 8 F.3d 202, 211 (5th Cir.1993); United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir.1991); United States v. Smith, 918 F.2d 1551, 1562-63 (11th Cir. 1990). The comment here was not improper. Accordingly, the court finds that Washington has not demonstrated that counsel rendered ineffective assistance for failing to object to certain comments made by the prosecution in closing arguments.
Claim (3)(e) is that counsel failed to object to the court's ex parte meeting in chambers with juror Nanine Woodward. After the court had given the final instructions to the jury, the court identified the alternate jurors, and Woodward, one of the alternate jurors, requested permission to *435 approach the bench to ask a question. (T2 690.) The court suggested that Woodward wait in chambers to ask her question there. (T2 690.) Washington claims that the ex parte meeting with Woodward was a "critical stage" of the prosecution at which Washington had the right to attend with counsel.
The determination of whether a proceeding is a "critical stage" turns on "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." See United States v. Wade, 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Arnold v. Evatt, 113 F.3d 1352, 1360 (4th Cir.1997). Clearly, no prejudice could have adhered in this situation because Woodward had been expressly discharged by the court[14] and she was no longer able to deliberate with the other jurors. Washington is incorrect in his suggestion that if a juror had taken ill later, Woodward could have replaced the juror at that point.[15] Moreover, had Woodward identified any juror misconduct in the ex parte meeting with the court, the court would have brought that fact to the attention of the parties. Accordingly, the court concludes that the exparte meeting with Woodward after she had been designated as an alternate was not a critical stage, and thus claim (3)(e) is without merit.
Claim (3)(f) alleges that counsel "failed to deliver an intelligent summation of the case in his closing argument, which could best be described as unintelligible rambling with no meaning what-so-ever, failing miserably to address even the general principles of reasonable doubt." (§ 2255 motion ii.) Regarding Washington's claim that Young did not address reasonable doubt, the court expressly prohibited counsel from attempting to define reasonable doubt. (T2 550-51.) Moreover, Young made several references to reasonable doubt. (T2 658, 662-64.)
Young's closing argument was not "unintelligible rambling." Rather, it focused on several themes that were relevant to Washington's defense, including that: the entire resources of the federal government were focused on one man (T2 644-15, 648-49, 665); Washington was not an offensive drug dealer, but rather a man who minds his own business and does not hurt others (T2 644, 646-48); the evidence was consistent with use, but not distribution, of drugs (T2 647, 649-50, 662); and the prosecution was unfairly selective and the multiple charges were overkill (T2 648, 651, 653, 656, 660-61, 663, 665). The choice of themes for closing argument is a strategic consideration that reviewing *436 court should accord substantial deference. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. In view of the overwhelming physical evidence in this case (scales, straws, baggies, tubes, spoons, pipes, an eyewitness, a fingerprint, evidence of prior intent to distribute, a gun under Washington's bed, Bartosh's testimony, Inositol, etc.), Young's themes seem appropriate, given his apparent alternatives. Accordingly, the court concludes that counsel did not render constitutionally ineffective assistance in his closing argument.
Claim (3)(g) alleges that counsel rendered ineffective assistance for failing to prepare and seek a lesser-included offense jury instruction for simple possession of cocaine base with respect to the charge that Washington possessed cocaine base with intent to distribute. A defendant is entitled to a lesser-included offense instruction if he requests and the evidence justifies it. United States v. Baker, 985 F.2d 1248, 1259 (4th Cir.1993). Failure to request an instruction on a lesser-included offense can be proper trial strategy. See Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir.1999) ("[I]n the context of instructions on lesser included offenses, we see particular strategy reasons why a defendant might not want to present to jury with a compromise opportunity."); United States v. Chandler, 996 F.2d 1073, 1099 (11th Cir.1993). In this case, possession was all but conceded, so Young could have opted for an all-or-nothing approach with the jury solely on the intent to distribute issue. See Parks v. Pitcher, 1999 U.S. Dist. LEIS 19679, *39-40 (E.D.Mich. Nov. 11,1999) ("In the present case, counsel's main strategy was to attack the intent to kill element and seek a complete acquittal for petitioner on these charges. Petitioner has failed to show that counsel's decision to attack the intent to kill element and seek a complete acquittal for petitioner on this ground was not reasonable trial strategy."). The court believes that counsel's choice to forego a lesser-included instruction in this case was a strategic decision to which the court accords considerable deference. Accordingly, the court concludes that Washington has not rebutted the strong presumption that Young's conduct fell within the wide range of objectively reasonable assistance. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Moreover, the strong evidence of distribution in this case makes it unlikely that the outcome of the trial would have been different had counsel requested a lesser-included offense. See id. at 694,100 S.Ct. 1945.
Claim (4) alleges that counsel rendered ineffective assistance for failing to withdraw at sentencing. However, the court advised Washington of the potential conflict and the possible detrimental consequences. (June 29, 1998 hearing 2-3.) The court advised Washington to talk to his attorney and others before deciding whether to keep Washington as his lawyer. (June 29, 1998 hearing 2-3.) The court gave Washington one month after first disclosing Washington's possible conflict to make up his mind. The court told Washington that his new attorney could request additional time to prepare for sentencing if he needed it. (June 29, 1998 hearing 6-7.) Moreover, the court solicited Washington's input about the possible conflict at the sentencing hearing and Washington replied, "Your Honor, I don't have anything to say about it." (Sentencing 4-5.) Furthermore, this was not a situation where Washington needed the court's permission to drop Young and have a new attorney appointed to represent him. Young was a retained attorney, and Washington could have fired him and hired a new one. These same considerations apply to the appellate context for claim (5). Washington *437 could have tired Washington and hired a new attorney to represent him on appeal.
Based on the foregoing, there are no grounds on which Washington is entitled to relief under § 2255 and the court therefore will deny his motion in its entirety. A separate judgment consistent with this opinion is being entered herewith.
Washington is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within sixty days of the date of entry of the judgment, or within such extended period as the court may grant pursuant to Rule 4(a)(5) or 4(a)(6).

JUDGMENT
In accordance with the opinion accompanying this judgment, it is hereby ADJUDGED AND ORDERED that
1. The motion to dismiss is GRANTED,
2. The motion to vacate, set aside or correct sentence under 28 U.S.C.A. § 2255 is DENIED; and
3. The clerk is directed to close the case.
NOTES
[1] There are two transcripts of the suppression hearing conducted on February 6, 1998. The first transcript, filed on February 13, 1998, docket entry 32, does not contain certain introductory remarks of counsel and the court. A second transcript of the same suppression hearing was filed on September 15, 1998, docket entry 78, and appears to contain all introductory remarks from counsel and the court. Because of the introductory remarks contained in the second transcript, the pagination differs between the two transcripts. Citations herein to the transcript of the suppression hearing refer to the original transcript, filed on February 13, 1998.
[2] The Washington family owns two houses in Wythe County: The larger, original, Washington family house and the smaller house where Washington lived. (T2 479.) The two houses are located approximately three and a half miles apart. (T2 480.) The five Washington brothers' names are on the deed to the smaller house where Washington lived. (T2 480.)
[3] Officers recovered a latent fingerprint matching Washington's fingerprints on the Winchester Model 14. (T2 377-79.)
[4] Inositol is a cocaine cutting agent, designed to enhance the volume of cocaine while retaining the visual quality of cocaine. (T2 186.) Inositol is also used as a dietary supplement. (T2 193.)
[5] Bartosh's testimony at the first trial was contradictory as to who initiated contact. On cross-examination, he testified that the police had initially contacted him. (Tl 2-192-93.) On redirect, Bartosh testified that he had read or heard a news story on Washington's case, and had then contacted the authorities. (Tl 2-203-04.)
[6] Washington's co-defendants all pleadedguilty pursuant to plea agreements.
[7] Counts one and three had been dismissed before the jury returned its verdict.
[8] On July 10, 1998, the court vacated certain of Washington's convictions under United States v. Dunford, 148 F.3d 385, 388-90 (4th Cir.1998) (holding that simultaneous possession of multiple firearms that are seized at the same time constitutes only one act of possession). Pursuant to Dunford, the court dismissed the convictions on counts six through nine and eleven through eighteen. Thus, counts four, five, ten, and nineteen remained.
[9] The entire portion of the Fourth Circuit's per curiam opinion relating to Young's disqualification reads as follows:

Banks' final claim is that the district court abused its discretion when it dismissed Banks' first attorney three months prior to trial on the basis of a conflict of interest. Again, we disagree. Banks' original counsel was under investigation by the same office of the United States Attorney that was prosecuting Banks. This conflict of interest, whether actual or apparent, was sufficient in magnitude to permit the disqualification. Hence, the district court did not abuse its discretion when it refused to allow Banks to waive the conflict of interest. See Wheat v. United States, 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).
Banks, 1999 WL 812333, *1, 1999 U.S.App. LEXIS 25485, *2-3.
[10] The court finds no merit to Washington's argument that Young did not want to recall Martin because he was seeking to avoid humiliating the prosecution's "star witness." This argument lacks merit because, if it were true. Young would not have recalled her to the stand and subjected her to a scathing cross-examination the first time. Moreover, as noted below, Young listened to the tape recording of her sentencing and determined that there had been no admission by Martin that she had purchased drugs.
[11] Of course, this analysis assumes that Young knew he was being investigated before the grand jury target letter was sent in April or June of 1998. In his reply brief, Washington asserts that Young admitted knowing that he had been under investigation as early as January of 1997. (Movant's Traverse to Government's Response 3.)
[12] Washington points to the dates and times that the warrants and affidavits were signed to indicate that the search warrants must have been signed at the same time. It appears that the affidavit for the warrant to search Beam's residence was signed on December 18, 1996, at 7:30 p.m., and that the warrant was signed five minutes later. The search warrant of Beam's residence was executed on December 18, 1996 at "2130 hours." Apparently, the magistrate did not note on the affidavit for the warrant to search Washington's house when he signed the affidavit. The warrant to search Washington's residence has a time marking that is barely legible, indicating that it was signed by the magistrate on December 18, 1996, at 9:35 p.m., but there appears to have been some alteration thereunder. The fact that the second affidavit was signed by the magistrate only minutes after the execution of the first warrant is consistent with Dunagan's testimony at the suppression hearing that he called the magistrate in Wytheville from Beam's residence and told the magistrate that the fruits of the search of Beam's residence bolstered Crockett's credibility. (Suppression 41-42.) The magistrate then signed the affidavit that Dunagan drafted at the same time he drafted the affidavit for the warrant to search Beam's residence. Dunagan drove back to get the warrant that had been signed by the magistrate and took it to Washington's residence to execute the second search. (Suppression 42-43.)
[13] In the § 2255 motion, Washington states only that "Movant Washington asserts also, that, had counsel interviewed government witness William `Bunky' Crockett, before the first trial, he would have been armed with effective cross-examination questions for Captain Dunagan." (§ 2255 50-51.) In the response to the government's motion to dismiss, Washington argues "Movant Washington specified that, had Mr. Young interviewed Crockett, he would have obtained information regarding the state of mind of Captain Dunagan, at the time that Crockett supposedly told the arresting officers about Movant Washington." (Movant's Traverse to Government's Response 28.) It is uncertain why Dunagan's state of mind was relevant when Crockett informed Dunagan about the firearms in Washington's residence, because Crockett's information was borne out during the search of Washington's residence.
[14] Just before Woodward asked her question, the court stated:

Mr. Smith and Ms. Woodward, you are the two alternates in the case, and we can only decided the case with twelve persons. So unfortunately, you will not be able to deliberate on the verdict. I want to thank you for serving on this jury. Service on American jury is one of the highest responsibilities and privileges of American citizenship, and even though you do not have an opportunity to deliberate in this particular case, your service over the last several days has been outstanding, and I want to thank you. When you leave here today, really you ought to hold your head a little higher that you've had the opportunity to serve, but you are now discharged. Thank you very much.
(T2 689-90.)
[15] After Washington's trial, the Federal Rules of Criminal Procedure were amended to permit the retention of alternates in order to replace regular jurors after deliberations have begun. See Fed.R.Crim.P. 24(c) advisory committee notes to 1999 amendments. Until that amendment, the court was required to discharge all alternate jurors when the jury retired to deliberate, as was done here. See id.